IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| EUNICE BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 04-0495-CV-W-REL-SSA |
| JO ANNE BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Eunice Brown seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for a period of disability and disability insurance benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that (1) the ALJ failed to properly assess plaintiff's credibility, (2) the ALJ erred in failing to accord adequate weight to the opinion of plaintiff's treating psychiatrist, Dr. Vaughn[1], and (3) the ALJ erred in concluding that plaintiff could perform her past relevant work. I find that plaintiff's arguments are without merit, and the substantial evidence in the record as a whole supports the findings of the ALJ. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

---

[1]James W. Vaughn, M.D., was plaintiff's treating physician and it is his opinion at issue. Plaintiff was also examined by a consulting psychologist, Douglas Vaughan, Ph.D.

# I.    BACKGROUND

On April 8, 1999, plaintiff applied for a period of disability and disability insurance benefits alleging that she had been disabled since January 1, 1997. Plaintiff's disability stems from mental illness, depression, low sugar, and tumor. Plaintiff's application was denied initially and upon reconsideration. Plaintiff filed a request for a hearing on September 22, 1999. The request was dismissed by the ALJ on July 22, 2000, based on plaintiff's failure to appear for the hearing on June 13, 2000. On September 18, 2002, the Appeals Council remanded for further proceedings on whether plaintiff was an essential witness. On March 23, 2003, a hearing was held before an Administrative Law Judge. On June 13, 2003, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On April 5, 2004, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

# II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial

2

evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is

3

unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

4

5.      Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of Ruth Carter, plaintiff's attorney; George Chance, Ph.D., a medical expert; and Marianne Lumpe, a vocational expert, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1975 through 2002:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1975 | $      348.00 | 1989 | $   15,245.65 |
| 1976 | 59.40 | 1990 | 17,207.06 |
| 1977 | 2,905.30 | 1991 | 17,328.81 |
| 1978 | 782.04 | 1992 | 2,603.68 |
| 1979 | 1,336.17 | 1993 | 795.00 |
| 1980 | 5,941.68 | 1994 | 0.00 |
| 1981 | 0.00 | 1995 | 12,731.47 |
| 1982 | 0.00 | 1996 | 19,374.31 |
| 1983 | 0.00 | 1997 | 0.00 |

5

| 1984 | 1,869.20 | 1998 | 0.00 |
|------|----------|------|------|
| 1985 | 8,107.72 | 1999 | 6,768.00 |
| 1986 | 4,153.84 | 2000 | 12,447.51 |
| 1987 | 13,752.30 | 2001 | 20,490.98 |
| 1988 | 14,176.08 | 2002 | 12,718.02 |

(Tr. at 109-125).

**Records from Boys & Girls Clubs of Greater Kansas City.**

Plaintiff's attorney sought information about plaintiff's employment subsequent to her alleged onset date and received records from the Boys & Girls Clubs of Greater Kansas City indicating that plaintiff was employed there from August 16, 2002, through October 29, 2002 (Tr. at 127-129). She was paid $2,076.92 in September, $2,076.92 in October, and $1,657.61 in November (Tr. at 128). The records include a questionnaire completed by Brian Evans, plaintiff's supervisor (Tr. at 129). Mr. Evans stated that he was not aware during plaintiff's employment of any physical or mental impairments that affected her ability to work (Tr. at 129). Mr. Evans stated that no accommodations were made during plaintiff's employment (Tr. at 129). He noted that plaintiff's attention and/or concentration were deficient, her work pace (physically or mentally) was deficient, and her ability to work with co-workers and the public was adequate (Tr. at 129).

**Disability Report - Field Office**

On April 8, 1999, C. Salazar completed a Disability Report - Field Office (Tr. at 130-133). The counselor had a face-to-face meeting with plaintiff and observed that

plaintiff had no difficulty hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing (Tr. at 132).

**Disability Report - Adult**

On April 8, 1999, plaintiff completed a Disability Report (Tr. at 134-143). Plaintiff alleged that she suffers from mental illness, depression, low sugar, and "tumor removed". She stated that she had trouble concentrating, could not sleep and suffered from anxiety. She wrote that she had been laid off over two years earlier (Tr. at 135).

**Claimant Questionnaire**

On May 6, 1999, plaintiff completed a Claimant Questionnaire (Tr. at 165-168). Plaintiff stated that she is tired, depressed, has a lack of concentration, does not want to take a bath, does not want to go anywhere, feels sick and in extreme pain every day and does not know what causes her symptoms (Tr. at 165). When asked what she does to relieve her symptoms, plaintiff stated that she says in bed and lets the symptoms pass (Tr. at 165). She stated that she did not know whether she has any side effects from her medication (Tr. at 165). Plaintiff was living with her two children at the time. She did not do much housework, and mostly fed her family frozen dinners. She dreads going shopping for food and often sends her son. Plaintiff no longer spends time with friends, and will not answer the door if her friends come over. When asked if she reads, plaintiff wrote, "I can't read books anymore. My 5 yr. old daughter demand[s] all of my

7

attention." Plaintiff reported having a driver's license and stated that she goes to see counselors and psychiatrists, she goes to the store occasionally, and she goes to see teachers occasionally (Tr. at 167). She does not get along well with her family, she stays away from her neighbors, and she has no more friends (Tr. at 168). She takes care of her children with her son's help.

**Report of Contact**

On May 27, 1999, a report of contact was completed which states as follows: "Voice mail response to MC inquiry if there had been improvement since initial psychiatric evaluation on 4/8/99. Dr. Vaughn last saw ct. [claimant] on 5/6/99 who was 'feeling better' and had improved energy and sleep, decreased depression, and improved eating. She has a history of hypoglycemia and a vaginal tumor for which she is to be followed at TMC clinic. Ct. is 'making gradual improvement,' and she is on Zoloft and Benadryl." (Tr. at 229).

**Letter from Plaintiff**.

On June 22, 2000, plaintiff wrote a letter to Administrative Law Judge Keith Sickendick (Tr. at 68). The letter stated that plaintiff had failed to appear for her hearing because she was in too much pain which also made her terribly depressed.

**Order of Dismissal**.

On July 19, 2000, Judge Sickendick entered an order of dismissal, noting that although plaintiff claimed to be in severe pain and terribly depressed, she did not offer

any evidence of seeking medical assistance due to the severity of her symptoms (Tr. at 39).

**Order of Appeals Council**

On September 18, 2002, the Appeals Council reversed Judge Sickendick's order of dismissal on the ground that plaintiff's representative appeared for the hearing and the judge failed to consider whether plaintiff was an essential witness (Tr. at 74, 288-289). The Appeals Council directed that if plaintiff were determined to be an essential witness, she should be offered another hearing.

**Report of Contact**

A Report of Contact completed by Disability Determinations Counselor Wendy Geels reveals that plaintiff failed to show up for her consultative appointment with Dr. Shabbir on January 14, 2003 (Tr. at 80-82). Plaintiff requested a new appointment. The counselor tried to call plaintiff but there was no answer. A letter was sent to plaintiff informing her that the appointment had been rescheduled, but will only be rescheduled this one time so she must show up. Plaintiff failed to show up for the rescheduled exam on January 28, 2003.

**B.** *SUMMARY OF MEDICAL RECORDS*

Below is a summary of the medical records, to the extent they are relevant and legible.

Case 4:04-cv-00495-REL   Document 14   Filed 05/04/05   Page 9 of 50

On February 15, 1996, plaintiff was seen at Truman Medical Center (Tr. at 210). Plaintiff injured her thumb the day before when she prevented a chair from falling on her two-year-old child. She was prescribed a left radial splint.

On February 29, 1996, plaintiff returned to Truman Medical Center (Tr. at 209). She arrived wearing a splint and complained of pain and numbness in her left thumb. "Ibuprofen prescribed at last visit, states she's not taking it [because] 'afraid it will make me sleepy.'"

Plaintiff's alleged onset date of disability is January 7, 1997 – nearly a year after her Truman Medical Center visits.

On April 30, 1997, plaintiff saw Cathy Deppen, M.D., at Truman Medical Center (Tr. at 202-203). She had an excision of a perineal cyst and was discharged to home the same day, activity as tolerated.

On February 4, 1998, plaintiff was seen at Truman Medical Center for a follow up on a lump under her armpit (Tr. at 198-200). She was referred to the surgery clinic.

Plaintiff was seen at Truman Medical Center on October 31, 1998 (Tr. at 197). The records are completely illegible except "very anxious", and it appears plaintiff "hollered" at someone. Plaintiff was being seen for gynecological issues.

On January 7, 1999, plaintiff returned to Truman Medical Center (Tr. at 195-196). Plaintiff had complaints of vaginal spotting and incontinence. "Also reports feeling depressed once brother killed 1 month ago." A sample of the vulvar lesion was taken

with local anesthetic. "[Patient] did not tolerate procedure well. She became extremely upset and hysterical saying she was tired, couldn't eat and was depressed because her brother had been murdered. When asked if she was suicidal or homicidal or had a plan to kill herself or anyone else, she stated she wasn't. [Patient] stated she must follow up with Behavior." The caregiver assessed, among other things, depression.

On February 4, 1999, plaintiff returned to Truman Medical Center for a pathology conference (Tr. at 194). She was told that she had a granular cell tumor of the vulva, which was benign. She was scheduled for a wide local excision on February 15, 1999.

On March 5, 1999, plaintiff was seen at Truman Medical Center for congestion and cough, and she requested new medication for her allergies (Tr. at 193).

On March 18, 1999, plaintiff underwent a repeat wide local excision of the granular cell tumor, which was incomplete (Tr. at 194).

On March 29, 1999, plaintiff was seen at Truman Medical Center by S. Messer, M.D. (Tr. at 192). Plaintiff was 14 days status post wide local excision of the vulvar granular cell tumor with path showing incomplete excision again. Dr. Messer discussed the results with plaintiff and provided options of repeating the wide local excision or closely following up with repeat excision if the nodule should recur. Dr. Messer performed an exam: the area of the excision was well healed, there was no evidence of

infection, no edema or erythema. Plaintiff was positive for hemorrhoids. Plaintiff agreed

to be seen in six months.

The following day, on March 30, 1999, plaintiff saw Anna Weimer, a licensed

clinical social worker, for an initial client screening (Tr. at 237-240). Plaintiff had been

referred by her primary care physician for depression symptoms that included lack of

sleep, agitated and irritable mood, loss of interest in friends, isolative behavior, crying

spells, and hopeless feelings. "Cl[ient] smokes THC [marijuana] about every other week

and smokes 1/4 of a joint at a time . . . 'I hate alcohol because my dad was an alcoholic.'

Oldest brother was alcoholic, younger brother was drinker and mental health issues and

was murdered 11/98." Observation: "The cl[ient] is on time for her appointment.

Nothing remarkable noted with gait. She was well dressed and groomed and was of

average height and weight in appearance. She was oriented to place and person and

could not remember the date except, 'it's close to Easter.' Cl[ient] was experiencing

crying spells in session. She denied any suicidal ideation currently or intent/plan. Fund

of know[ledge] was average." Ms. Weimer recommended that plaintiff attend a

depression class starting on April 2, 1999, and read a depression pamphlet by the next

office visit. Ms. Weimer's diagnostic impression was Axis I: major depression, severe,

recurrent and psychosis at the present, rule out post traumatic stress disorder; Axis V -

61-70, current: 49 for one month[2].

------

[2]Axis V refers to the Global Assessment of Functioning ("GAF"). A GAF of 61-70
means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty

On April 8, 1999, plaintiff applied for disability benefits. That same day, from 8:30 a.m. until 9:15 a.m., she saw James W. Vaughn, M.D. (Tr. at 234-236). Her chief complaint was, "I have troubled sleeping and just can't get it together." Portions of Dr. Vaughn's report appear below:

History of Present Illness:

. . . She reports that she was mildly depressed [in early 1997]. She notes that she lost her job in December of 1997 when the job "closed down". She felt that working helped keep her mind focused. She reports that she has had trouble with depression too over the death of her dad in around 1993 or 1994. She was very close to him. She has been increasingly depressed the past year and particularly since her ill brother was robbed and killed in November of last year. He was 46 years of age and she reports that she worked with him considerably over the years, that she helped him get through school and taught him to read. She describes him as having a learning disability and being autistic. . . . She is tearful as she talks of his death and she has much anger over his death. She notes that she has much difficulty sleeping and has nightmares regarding his death. She states she saw the murder one time in the course of her dreams. . . . She denies having any suicidal thinking and says that she has to raise her children. Her appetite is up and down. She eats one meal a day and I told her to eat three meals a day even though she may not care to eat. . . .

Past History/Family History:

She reports that her father died in about 1993/1994. He was in the Army and patient reports that she was his favorite. Her mother is 71 and living in Arkansas. She reports that she is in good health. She feels that she never had a good relationship with her mother. She feels that her mother verbally abused her. She had a total of three brothers and one was killed (as noted in Present Illness). She has a total of ten sisters; client is in the middle chronologically. She notes her

in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. A GAF of 49 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

Case 4:04-cv-00495-REL   Document 14   Filed 05/04/05   Page 13 of 50

grandmother killed herself by slitting her throat. She apparently has a sister who is schizophrenic. . . .

Marital History:

Client has been married twice. The first marriage was in her early 20's and she was married some three years and had one child, a boy, who is now 17. She married a second time and is still married. Client lives with her two children. She takes care of her two children and does volunteer work when she feels able.

Drug and Alcohol Usage:

Client notes that she uses marijuana about one to three times a week. She denies usage of any other drugs. She denies any problem with usage of alcohol.

Mental Status Examination:

Client was well-kept, alert and cooperative [and] she was clean in appearance. She wears long circular earrings. She appeared her age. She was depressed and tearful during the course of the interview. She showed evidence of much anger toward the person or persons who killed her brother. There is no evidence of suicide or homicidal thinking. She reports mood swings in which she will feel hyper at times in the past and has worked two jobs and now she feels depressed most of the time. There is no current evidence of hallucinations. She does show evidence of suspiciousness. No evidence of delusional thinking. Client is well-oriented and she appears of average intelligence. She does have much difficulty with concentrating and focusing. She is unable to focus long enough to do 100 minus 7 serially or do a simple word problem. She does well in proverb testing and judgement is intact. Insight: She does have some insight into her illness.

Diagnosis:

| Axis I: | Major Depressive Disorder, Severe, Recurrent, Without Psychosis Probable PTSD [Post Traumatic Stress Disorder] . . . |
|---|---|
| Axis V: | GAF: 51[3] |

---

[3]A Global Assessment of Functioning of 51 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

Plan:

1.    The plan will be to place client on Zoloft 50 mg in the a.m.  I will also
      prescribe Benadryl 50 mg at bedtime if needed for sleep. . . .

2.    Client will also continue to see Anna Weimer in counseling.

(Tr. at 234-236).

On April 27, 1999, plaintiff was scheduled to see Anna Weimer, social worker, at

9:00 a.m. (Tr. at 233).  "[Client] was contacted in reference to 'no show' today and was

advised that a fee was charged to account each time she failed to cancel.  She was

requested to reschedule ASAP."  At 2:00 p.m., plaintiff called and said she had been sick

all weekend and had forgotten her appointment that day.  She was rescheduled for May

7, 1999, and reminded of the "now show" charge on her account each time she failed to

cancel.

Plaintiff saw Dr. Vaughn for a 20-minute appointment on May 6, 1999 (Tr. at

230).  "Client notes that she is feeling better.  She feels better energy and is sleeping

better.  She notes that she can go to the basement now without someone with her.  She is

less depressed and generally seems to have better energy.  She notes that she is eating a

little better now.  . . .  She will be continued on the same medication . . . and I will see her

in one month."

That same day, Dr. Vaughn competed a form sent by Disability Determinations

(Tr. at 225, 233).  Dr. Vaughn reported that no testing was ever done, that he first saw

plaintiff on April 8, 1999, and last saw her on May 6, 1999.  He then wrote, "Feel clt

15

[client] would have a difficult time doing a full time job currently because of depression problems and focusing difficulties and with being around others. I will continue to follow her in medication clinic and she'll follow up at TMCW [Truman Medical Center West] because of her physical problems – hypoglycemia, [illegible] bp [blood pressure], and recent tumor removal."

Under "Doctor's notes", Dr. Vaughn wrote, "SS form for DDS filled out after chart review & I also talked to Brooke Hamptom re: [illegible] she states medical records sent on my evaluation but they have nothing specifically from me and my evaluation re: ability to work.

Also on May 6, 1999, plaintiff saw social worker Anna Weimer for a one-hour visit (Tr. at 232). Plaintiff reported that her sleep had increased to four to five hours nightly, her mood was less irritable, she was taking better care of hygiene and grooming with daily showers, she had felt an increase in motivation to get beyond sitting at her window all day and felt a bright mood overall." Her crying spells had decreased from daily to two to three times per week currently. She had not attended the depression group because her memory had been poor. "She also saw psychiatrist today and requested that he fill out disability papers until she could get back on her feet with her depression." "[Client] was rewarded and encouraged to place on calendar the time of the support group." GAF 55 [moderate symptoms, see footnote 3].

16

On May 20, 1999, plaintiff returned to see social worker Anna Weimer for a one-hour visit (Tr. at 231-232). Plaintiff reported that her symptoms of depression had decreased, she was getting six hours of sleep at night, up from two. She rated her depression as a 5, where it had originally had been a 10 on a scale of 1 to 10. Plaintiff's crying spells had continued to decrease and were about one time per week. "[Client] stated she couldn't attend depression group due to needing to cook for kids at that time." Plan: Go to church at least two times before next visit, reschedule in two weeks, GAF 58 [moderate symptoms].

On May 27, 1999, plaintiff saw Douglas Vaughan, Ph.D., a psychological consultant (Tr. at 211-219). Dr. Vaughan found that plaintiff's mental impairment was severe but not expected to last 12 months and it was based on affective disorders, or major depression and anxiety. He found that plaintiff suffered from slight restriction of activities of daily living; moderate difficulties in maintaining social functioning; and often experiences deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner.

That same day, Dr. Vaughan completed a Mental Residual Functional Capacity Assessment (Tr. at 220-222). Dr. Vaughan found no evidence of limitation in plaintiff's ability to understand and remember detailed instructions. He further found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

17

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was moderately limited in the following:

- The ability to carry out detailed instructions

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to interact appropriately with the general public

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

(Tr. at 220-222).

Dr. Vaughan cited the Medical Source Opinion of Dr. Vaughn[4] (plaintiff's treating psychiatrist) but noted subsequent improvement (Tr. at 222). Dr. Vaughan's conclusion was as follows:

> While impairment of depression is significant, with continued adherence to treatment it could reasonably be expected to improve within 12 months from onset. Onset is seen as 1/99 when depression was first mentioned by PCP [primary care physician]. Onset also related to situational stressor of brother's death in 11/98. Ct. [claimant] has been involved in a work-related task of teaching others how to clean since 2/99 reportedly to present. Prospects for a positive prognosis would seem enhanced with ct.'s [claimant's] college education, work history of holding jobs, identifiable stressor, and h/o [history of] only isolated periods of depression. Ct. [claimant] anticipated to perform at least simple jobs and relate to others without extensive contact or a demanding setting.

(Tr. at 222).

On June 2, 1999, plaintiff called Comprehensive Mental Health Services (the office of social worker Anna Weimer and Dr. Vaughn) to confirm her appointment for the next day (Tr. at 231). "She stated she would be in attendance."

The following day, on June 3, 1999, plaintiff failed to show up for her appointment (Tr. at 231). Social Worker Anna Weimer wrote, "[Client] called and

_____

[4]The last names of these two doctors are almost identical, but note that the consulting doctor's name is "Vaugh**a**n" and the treating doctor's name is "Vaughn" (without the additional "a").

19

stated she ran late with school counselor for son (he made a 'B' and was upset) and wondered if she could still keep appt. She advised it would take her 20 minutes to get here. She was rescheduled for 1 week and advised she also needed to reschedule with the psychiatrist. She reports feeling brighter."

On June 3, 1999, plaintiff did see Dr. Vaughn who wrote, "Client notes that she is doing better. She notes that she is not burning herself now or trying to scrub her face real clean. She is much more freed up to do things that she wants to do (i.e., go to the graveyard, go to the basement alone). She is sleeping much better now and denies any further nightmares. She is compliant. She notes that she was seen over a year ago by a visiting nurse regarding low blood sugar. She was advised to see the doctor. She has not seen the doctor yet, so I referred her to TMC-West [Truman Medical Center - West] where she has gone in the past. She does keep active through the day. The plan will be to increase the Zoloft to 100 mg in the morning and continue with the Benadryl, and I will see her in five weeks."

The following day, on June 4, 1999, plaintiff saw a doctor whose name is illegible (Tr. at 178). Plaintiff alleged multiple symptoms (tired, sick every day, extreme pain in her private area, low sugar). Recently had benign tumor of vulva excised. "Could cause some pain, but would not be expected to last a year. No other physical medically determinable impairments. Non-severe. Clmt [claimant] cannot return to past work. Send to other work."

On June 14, 1999, plaintiff had a one-hour visit with social worker Anna Weimer (Tr. at 227). Plaintiff reported her sleep had improved, and her symptoms of depression were improving. "Claimant then admitted to a history of hearing voices and tactile hallucinations before [illegible] ensued. She described scratching skin off of face due to feeling 'there were bugs on my face.' She has also burned her hands with cigarettes due to voices in the past. The last psychotic episode was around 6/4/99 when she heard her son's voice when he was at school and became paranoid that her children were being abused. She has dealt with paranoia in the past by increased isolative behavior. Claimant was educated on the importance of sharing this info with her psychiatrist and of meds to decrease this. Claimant was embarrassed but receptive. Talked about relationship of love/hate with mom and attributed this to mom's hatred for dad (claimant looks like him). Reschedule in 2 weeks, discuss with Dr. about symptoms. GAF 58 [moderate symptoms]."

On June 28, 1999, plaintiff did not appear for her appointment at Comprehensive Mental Health Services (Tr. at 226, 256). "Claimant stated that she was ill and had some medical issues that held her back from her appointment today that she believes to be related to her surgery for her tumor. She has her daughter's father back in the home to help out as well. Claimant was advised to schedule when feeling better."

On July 8, 1999, plaintiff canceled her appointment with Comprehensive Mental Health Services (Tr. at 226, 256).

21

On July 21, 1999, plaintiff saw social worker Anna Weimer (Tr. at 255-256). Plaintiff reported that her crying spells had decreased by about 20% with the last bout on July 19, 1999, with report of Kennedy's plane crash. "She has always followed the Kennedys and thought of her brother's death when the crash was announced. Was asked to rate her depression on a scale of 1-10. She said initially it was a 13, now it is a 3-5. Isolative behavior is still an issue and has decreased slightly. Sleep on good nights up to 6 hours, bad nights about 50% of the time during past month. Kids have asked her why she makes odd noises and talks to herself. She is working temporarily as an aide in a mental health setting with varied hours but not regular. GAF 56 [moderate symptoms]."

On July 28, 1999, plaintiff failed to show for her appointment at Comprehensive Mental Health Services (Tr. at 255).

Plaintiff saw Janice Hendler, M.D., on August 3, 1999 (Tr. at 177). "Alleges nervous stomach, diarrhea, 'tumor on bottom.' Med reveals vulvar granular cell tumor (excised 3/99), IBS [irritable bowel syndrome] on [illegible] - no severe impairment."

On August 11, 1999, plaintiff failed to show for her appointment at Comprehensive Mental Health Services (Tr. at 255). That same day, Anna Weimer wrote a letter to plaintiff pointing out that she was a no show for both therapy and with the psychiatrist and encouraging plaintiff to reschedule. "If I don't hear from you in 2 weeks, I will assume that the issues that brought you into treatment have been resolved and you no longer need my assistance."

22

On August 25, 1999, plaintiff failed to show for her appointment at Comprehensive Mental Health Services (Tr. at 255).

On September 22, 1999, she requested an administrative hearing.

On October 1, 1999, Anna Weimer noted that plaintiff "dropped out of service" but her condition at discharge was "improved" (Tr. at 253). Final diagnosis was major depressive disorder, single episode with psychosis, rule out post traumatic stress disorder late onset, GAF 56 [moderate symptoms]. The record reflects that plaintiff was prescribed Zoloft and Benadryl on June 3, 1999, has been a no show since July 28, 1999, with no current appointments. She was discharged for non-attendance. She no showed twice for the psychiatrist and twice for the therapist. She was last seen in person on July 21, 1999, and she made no response to the letter of interest.

The following summer, on June 13, 2000, plaintiff failed to appear for her administrative hearing. Her case was dismissed on July 2, 2000. On September 18, 2002, the Appeals Council reversed the dismissal. There are no medical records covering this period of more than three years.

On February 26, 2003 – more than three and a half years after her last visit at Comprehensive Mental Health Services – plaintiff was seen at Truman Medical Center Behavioral Health Network (Tr. at 262-275). Plaintiff was observed to be "very agitated, appeared to be responding to internal stimuli, guarded, paranoid, standing in corner shuffling back and forth behind a chair looking alternatively angry, tearful, suspicious,

23

and mildly threatening." She was able to regain composure with calm conversation. She was given Ativan. She agreed to an assessment for inpatient stay.

Plaintiff reported that the problems started when her brother was killed. She said she sleeps off and on, said she has to tire herself out in order to get any sleep. She recovered from her depression after her brother died but now it is reoccurring. Plaintiff had smoked marijuana in the past three days. She reported that she had burned herself and scratched the skin off of her face after her brother died, but she was not aware of it. She has been using marijuana, isolation is off and on. She said her brother was murdered three to four years ago. "I blocked it out. Could've been 2-3 years ago." Has a Bachelor of Social Work degree. She last worked at Boys & Girls House but was fired. "Currently receiving unemployment but it's about to run out. Her husband receives SSI. Plaintiff has applied for SSI."

"Although Ms. Brown lives outside this service area, she refused treatment at Swope Parkway Health Center and at Samuel U. Rodgers Health Center due to her previous interactions with people there when she was a social worker. Ms. Brown is extremely anxious and fearful of people seeing her in such distress which has impeded her treatment. Ms. Brown admits to previous episode of depression shortly after her brother was murdered for which she received successful treatment through medication and counseling. It's unclear how long this episode has lasted but it apparently impaired her job performance resulting in her termination in 10/02. Ms. Brown's brother's murder was

24

traumatic and appears to have precipitated her psychiatric distress since she denies problems previously.  Ms. Brown experiences recurrent and intensive recollections about her brother's murder, avoids stimuli associated with the trauma (failure to recall date, avoids site, avoids thinking/talking about it) and experiences persistent symptoms of increased arousal (poor sleep, poor concentration, [illegible]), which weren't present prior to the murder.  It's likely Ms. Brown will be successful with recovery due to her previous high functioning.  However, she is experiencing severe distress with impaired functioning and will likely require a great deal of time to achieve successful recovery.  Family and friends are supportive and she's willing to accept treatment."

On March 17, 2003, plaintiff was seen at Truman Medical Center Behavioral Health Network (Tr. at 261).  This entire record is completely illegible.[5]  However, plaintiff states in her brief that "[h]er presentation was anxious and talkative and her speech was tangential.  She was diagnosed with psychotic disorder and prescribed medications including Klonepin and Paxil."  Defendant, in her response, states that she agrees with plaintiff's statement of facts.  Therefore, I will accept that the illegible medical records for this visit reflect as stated by plaintiff.

The following week, on March 25, 2003, plaintiff's rescheduled administrative hearing was held.

_____

[5]The medical expert, Dr. Chance, testified that these records, although good copies, were completely illegible to him as well (Tr. at 312).

Case 4:04-cv-00495-REL   Document 14   Filed 05/04/05   Page 25 of 50

## C.     SUMMARY OF TESTIMONY

On June 13, 2000, an administrative hearing was held; however, plaintiff failed to show up and her case was subsequently dismissed, although that decision was later reversed by the Appeals Council.  A transcript of that brief session, with no testimony taken, appears at pages 338-342 of the record.

During the March 25, 2003, hearing, plaintiff's lawyer, Ruth Carter, testified; Dr. George Chance, a medical expert, testified; and Marianne Lumpe, a vocational expert, testified at the request of the ALJ.  Plaintiff was present at the hearing but stated that she did not want to be present (Tr. at 292, 293, 294, 295).  Plaintiff began chanting, "Stay with me, Jesus" during the hearing until she was allowed to leave (Tr. at 293-294).

### 1.     Testimony of Ruth Carter.

Ms. Carter, plaintiff's attorney, testified that plaintiff was 39 years of age at the time of the hearing, she was married, and she still had one child living at home (Tr. at 298).  Plaintiff has a college degree, and her work experience has been primarily in social work (Tr. at 298).  Plaintiff's disability began on January 1, 1997, because of affective disorders including depression, panic, anxiety, and post-traumatic stress (Tr. at 299). Plaintiff's physical problems include multiple tumors, cancers[6], and OB/GYN problems (Tr. at 299).  Although plaintiff has talked about extreme amounts of pain, Ms. Carter is not aware of any physical difficulties that prevent plaintiff from working (Tr. at 300).

---

[6]Plaintiff alleged she had skin cancer as a child.

Case 4:04-cv-00495-REL   Document 14   Filed 05/04/05   Page 26 of 50

Plaintiff failed to appear at the June 13, 2000, administrative hearing, claiming she was ill and in an extreme amount of pain (Tr. at 300). Ms. Carter was unaware of what had caused the extreme pain (Tr. at 300). Plaintiff failed to appear twice for a consultative examination with a psychiatrist because she was ill (Tr. at 300). Plaintiff experiences anxiety and difficulty being around people, she has difficulty driving in the city and getting around, so getting to an appointment would be "almost impossible" for her (Tr. at 300-301). Someone from the mental health institute brought plaintiff to the administrative hearing that day (Tr. at 301).

2.      **Testimony of Dr. George R. Chance.**

Dr. George Chance, a psychologist, testified as a medical expert at the request of the ALJ (Tr. at 301). Plaintiff shows symptoms of an affective disorder, including anxiety, lack of sleep, and irritability (Tr. at 303). Plaintiff has not had ongoing psychotherapy (Tr. at 303). She has been treated with a combination of tranquilizers and antidepressant medicine (Tr. at 303). A tranquilizer is a central nervous system depressant meant to reduce anxiety, sleep disorder, irritability, and sadness (Tr. at 303). An antidepressant reduces the symptoms of irritability, sleep disorder, and social withdrawal (Tr. at 303). A tranquilizer may, instead of helping the symptoms, make them worse (Tr. at 304). Tranquilizers and antidepressants may work against each other, although they are commonly prescribed together for anxiety (Tr. at 304).

In the opinion of Dr. Chance, plaintiff's impairment does not meet or equal a listed impairment (Tr. at 304). There is nothing so pronounced or prolonged that would prove a severe mental health condition (Tr. at 304). The earliest evidence of plaintiff's affective disorder is March 1999 (Tr. at 306). An affective disorder can develop gradually or can have a quick onset (Tr. at 306). Dr. Chance is unable to tell from the record whether plaintiff's affective disorder occurred gradually or quickly (Tr. at 306).

Dr. Chance noted that the records do not establish that plaintiff was disturbed for a prolonged period of time, and the treatment records indicate she was improving (Tr. at 309-310).

Dr. Chance was questioned about the Mental Residual Functional Capacity assessment of DDS consulting psychologist Douglas Vaughan (Tr. at 310). Dr. Chance agreed that because Dr. Vaughan did not treat plaintiff and was relying on medical records, his observations would not have determined whether she was improving (Tr. at 311). Dr. Chance acknowledged that Dr. Vaughan found that plaintiff's concentration and focusing were impaired, but he testified that there is no evidence in the record to substantiate that conclusion (Tr. at 311).

Although Dr. Chance was unable to read the records of March 2003 due to the illegible handwriting, he was asked whether he saw anything in those records which would be inconsistent with "previous diagnosing treatment" of plaintiff (Tr. at 312). He testified, "If I can make this out correctly, I believe it says brief psychotic disorder, and

28

that is inconsistent with the other records that we've talked about so far. . . . [W]hat we've talked about so far would be signs of anxiety and signs of depression. And this, if I'm making it out, states that she's briefly psychotic, which is very different." (Tr. at 312-313).

Plaintiff's attorney pointed out records in which plaintiff claimed to have scratched the skin off her face because she thought there were bugs on her face, and she burned her hands with cigarettes (Tr. at 317). Ms. Carter asked whether that appeared to be some form of psychosis (Tr. at 317). Dr. Chance stated that "It does appear to be some form of psychosis, psychosis being hallucinations or delusions. The thing that wasn't clear to me, as to when it was." (Tr. at 317).

Dr. Chance acknowledged that there are statements in the record as to plaintiff's difficulty with concentration; however, "[u]nfortunately, there is no objective evidence. For example, no test results to show that." (Tr. at 319). He also noted that the only thing in the record indicating that plaintiff had trouble sleeping was her allegation that that was so (Tr. at 319).

Plaintiff has been assigned Global Assessment of Functioning scores of 44 and 54 (Tr. at 319). Although a person could not work at the moment he or she were found to have a GAF of 44, it is quite conceivable that such a person could be doing much better not only by the next day but by the next hour (Tr. at 320). Dr. Chance considers a GAF of 60 and above to indicate symptoms compatible with work (Tr. at 321).

29

Dr. Chance repeatedly stated that there was no evidence in the record as there are nothing but allegations of symptoms. He testified that if a person participated in ongoing psychotherapy, the therapist may be able to tell on a regular basis that the person could not concentrate or remember, then that may substantiate the person's allegations that she has difficulties in concentration (Tr. at 326). In this case, there is no psychotherapy and there are no tests to substantiate plaintiff's allegations (Tr. at 326).

**3.     Vocational expert testimony.**

Vocational expert Marianne Lumpe testified at the request of the Administrative Law Judge. Ms. Lumpe testified that plaintiff's past relevant work includes working as a case worker for Social Services, which is a sedentary skilled job, and she worked as a janitor in the late 1980's (Tr. at 329). That job was unskilled, medium exertional level (Tr. at 329).

If the ALJ were to find that plaintiff has a history of an affective disorder with mildly restricted activities of daily living and social functioning, persistence, concentration, and pace, the vocational expert would say that plaintiff did not have a barrier to performing her past relevant work (Tr. at 329-330).

If the ALJ found that plaintiff could not return to her past work but could perform sedentary work with mild limitations in activities of daily living, social functioning, persistence, concentration and pace, the vocational expert would testify that plaintiff could perform the full range of unskilled sedentary work, and unskilled light work (Tr. at

Case 4:04-cv-00495-REL   Document 14   Filed 05/04/05   Page 30 of 50

330). For example, the person could be a security monitor or an information clerk (Tr. at 330). There are 2,500 surveillance system monitor positions in Missouri and about 285,000 in the country (Tr. at 330). There are about 150 information clerk jobs in Missouri and about 15,000 in the country (Tr. at 330). The person could be a gate guard with 4,000 such jobs in Missouri and 410,000 in the country (Tr. at 331). She could also be a microfilm processor, which is light and unskilled with 300 jobs in Missouri and 12,000 in the country (Tr. at 331).

If a person had moderate difficulties in maintaining social functioning, she could not perform social work (Tr. at 332). The person may be able to do light cleaning at an office building without close supervision or working with other employees (Tr. at 332-333). If a person often experiences deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, the person could not work (Tr. at 333).

If the ALJ were to find that plaintiff had delusions and hallucinations that would moderately impair her concentration, persistence, and pace, or if she were severely impaired, the vocational expert would testify that the plaintiff could not perform substantial gainful activity (Tr. at 331).

If plaintiff would miss two, three or more days of work per month because of any combination of her problems, she would unable to perform work because her absenteeism

31

would be excessive and beyond tolerance (Tr. at 331-332). One day of unscheduled absence per month is the extreme tolerance (Tr. at 333-334).

## V.    FINDINGS OF THE ALJ

On June 13, 2003, Administrative Law Judge Jack Reed filed his opinion finding plaintiff not disabled at step four of the sequential analysis and alternatively at step five (Tr. at 23-32).

The ALJ noted that he had requested a consultative psychiatric examination prior to the hearing; however, plaintiff had failed to appear at two scheduled appointments (Tr. at 23). At the onset of the hearing, plaintiff exhibited agitated behaviors and requested to leave the hearing (Tr. at 23). Plaintiff left but her attorney stayed to participate (Tr. at 23).

Step One. The ALJ found that although plaintiff claimed disability since January 1, 1997, she was gainfully employed from 1999 through about October 2002, and is therefore not entitled to any disability prior to October 2002 (Tr. at 24).

Step Two. The ALJ found that plaintiff has an affective disorder, rule out post traumatic stress disorder; a recent surgical history of perineal cystectomies and drainage of a left axilla abscess; a remote history of occasional irritable bowel symptoms; a possible history of infrequent hypoglycemic episodes; and a childhood history of radiation therapy for skin cancer; and that the combination of these impairments is severe (Tr. at 28).

Case 4:04-cv-00495-REL   Document 14   Filed 05/04/05   Page 32 of 50

Step Three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 28).

Step Four.  The ALJ found that plaintiff's allegations of extreme mental and physical limitations are not credible (Tr. at 30).  He found that plaintiff retains the residual functional capacity for at least the full range of light work, and that she has only mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild deficiencies of concentration, persistence, or pace (Tr. at 30).  The ALJ then found that plaintiff retains the capacity to perform the requirements of her past work as a social services case worker (Tr. at 30).

Step Five.  Alternatively, at step five of the sequential analysis, the ALJ found that plaintiff could perform other work available in significant numbers in the national and regional economy (Tr. at 30).  For example, plaintiff could be a gate guard (4,000 jobs in Missouri and 410,000 in the country), a microfilm processor (300 jobs in Missouri, and 12,000 in the country), a surveillance system monitor (2,5000 jobs in Missouri, and 285,000 in the country), or an information clerk (150 jobs in Missouri and 15,000 in the country) (Tr. at 30-31).

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

Case 4:04-cv-00495-REL   Document 14   Filed 05/04/05   Page 33 of 50

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski v.

34

Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

The medical evidence contains documentation of treatment dated as early as February 15, 1996 [for an injured thumb]. The next most recent treatment notes are dated March 3, 1997, nearly 1 year later, just two months subsequent to the alleged onset date of disability, wherein a treating physician prescribed topical ointment [for] claimant's feet. . . . At that time, claimant admitted to occasional use of marijuana. . . . On April 30, 1997, claimant underwent surgical excision of a small perineal cyst. . . . The next most recent treatment note of record is dated about 8 months later, wherein claimant presented to the gynecology clinic. . . . The next most recent treatment note is dated over 11 months later, on January 7, 1999, wherein claimant presented to the gynecology clinic. . . .

[O]n March 30, 1999, claimant made her initial presentation to Comprehensive Mental Health Services, Inc. . . . On April 8, 1999, . . . claimant filed her concurrent applications for disability benefits. . . .

The next most recent treatment note of record is dated February 26, 2003, over 3 1/2 years later, and only 1 week subsequent to the date the Notice of Hearing was mailed. . . . [S]he admitted to continued marijuana use, and use as recently as 3 days earlier. Claimant also reported she had been working until October 2002, but was terminated; and that she was receiving unemployment benefits, which were soon to be terminated. . . .

. . . [T]he undersigned again notes claimant alleged an onset date of disability of January 1, 1997, due primarily to mental symptoms, but also due to pain resulting from physical impairments. Yet, the medical evidence of record surrounding the alleged onset date of disability reveals only medical treatment for physical complaints including the splinting of a fractured thumb and gynecological complaints, and reveals no indication of complaints of depressive symptoms or other mental limitation. . . . [H]er job ended at that time only because the job "closed down" and not due to depression , mental limitation, or physical impairment. The 1999 treatment notes demonstrate that claimant underwent a 4-month period of psychotherapy, with use of psychotropic medications, and that

35

Case 4:04-cv-00495-REL    Document 14    Filed 05/04/05    Page 35 of 50

she achieved a rapid and substantial improvement in her condition. . . .  [T]he evidence of record demonstrates claimant did not seek any further medical treatment for her alleged disabling mental pathology for a timeframe of 3 1/2 years thereafter.  Moreover, the psychiatrist's opinion . . . regarding claimant's "difficulty" for full-time work is directly contradicted by claimant's own demonstrated ability to perform substantial gainful activity in 1999 through at least October 2002.  Claimant's earnings during that timeframe clearly exceed the levels presumptive of substantial gainful activity, are inconsistent with her allegations of disability during that time, and technically preclude a finding of disability during that timeframe. . . .  [C]laimant admitted that she was then currently receiving unemployment benefits that were soon going to end.  The undersigned notes that eligibility for unemployment benefits generally involve an individual's endorsement that [she is] ready, willing, and able to perform gainful employment; and such is inconsistent with claimant's allegation of disability.

(Tr. at 25-29).

## 1. PRIOR WORK RECORD

In this case, the ALJ pointed out the very unusual fact that plaintiff earned substantial income after her alleged onset date.  In fact, plaintiff's highest annual earnings occurred while she was allegedly disabled.  Plaintiff earned a total of $52,424.51 from 1999 through 2002 – all years that she was allegedly disabled.  As defendant points out, the ALJ requested a bench brief or some other document explaining these earnings subsequent to plaintiff's onset of disability.  Plaintiff offered no explanation for these fairly substantial earnings after her alleged onset of disability.  Work performed during any period in which a claimant alleges she was under a disability may demonstrate an ability to perform substantial gainful activity.  20 C.F.R. §§ 404.1571, 416.971; Naber v. Shalala, 22 F.3d 186, 188-89 (8th Cir. 1994).  Even part-time work can be inconsistent with a claim of disability.  Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004).

36

There is other evidence besides plaintiff's significant post-disability earnings which support the ALJ's credibility analysis. While plaintiff was working at Boys and Girls Clubs, her supervisor was not aware of any physical or mental impairments that affected her ability to work, and he made no accommodations for any disability. He specifically noted that her ability to work with co-workers and the public was adequate. Plaintiff held this job during late 2002, more than four years after her alleged onset date.

In 1999, plaintiff indicated that she left her last job because it "closed down". When a claimant leaves a position for reasons unrelated to a disability, an ALJ may consider that fact in assessing the claimant's credibility. Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003). In addition, in 2003 (five years after her alleged onset date), plaintiff reported that she was receiving unemployment benefits which would run out soon. A claimant who applies for unemployment compensation benefits holds herself out as available, willing, and able to work. Because such an application necessarily indicates an ability to work, it is evidence which negates an applicant's claim of disability. See Hernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991).

This factor clearly supports the ALJ's credibility analysis.

## 2. DAILY ACTIVITIES

In plaintiff's Claimant Questionnaire dated May 6, 1999, she reported that she can no longer read books. However, her inability to read was not due to a disability but because her five-year-old daughter demands all of her attention. Plaintiff reported that

she is able to drive to see counselors and psychiatrists, she goes to the store, she goes to see her kids' teachers. She is able to take care of her children and she does volunteer work. She told Dr. Vaughn in June 1999 that she keeps active throughout the day. In July 1999, plaintiff was working as an aide in a mental health setting. Plaintiff reported for several years that she was using marijuana regularly.

I have been able to find no other evidence of daily activities in the record. The daily activities outlined above are inconsistent with plaintiff's allegations of disability.

Plaintiff told Anna Weimer, a social worker, on June 14, 1999, that plaintiff had in the past scratched the skin off her face because she thought there were bugs on her face, and she burned her hands with cigarettes because she heard voices. On February 26, 2003, she told someone at Truman Medical Center Behavioral Health Network that she scratched the skin off her face after her brother died. There is no evidence to support these allegations. Plaintiff's brother died in November 1998. She was seen at Truman Medical Center on January 7, 1999, for gynecological issues, and admitted that she had felt depressed since her brother was killed "one month ago." There were no allegations by plaintiff of having scratched the skin off her face or burned her hands during the previous month, and none of the medical records reflect any such observation by any medical professional.

I find that this factor supports the ALJ's credibility analysis.

38

3.    *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

On April 8, 1999, C. Salazar from Disability Determinations, had a face-to-face meeting with plaintiff and observed that she had no difficulty with understanding, coherency, concentrating, talking, or any other ability.  On March 30, 1999, Anna Weimer observed that plaintiff arrived on timed for her appointment, she was walking normally, she was well-dressed and groomed, and she was oriented to place and person. On April 8, 1999, Dr. Vaughn observed that plaintiff was well-kept, alert, cooperative, clean in appearance, and wore long circular earrings, contrary to plaintiff's allegations that she was too depressed to bathe or care for herself.

On May 6, 1999, plaintiff told Dr. Vaughn that she was feeling better, she had more energy, was sleeping better, was less depressed, and was eating better.  Plaintiff also told Anna Weimer in May 1999 that she was sleeping better, her mood was less irritable, she was taking better care of her hygiene and grooming with daily showers, she had an increase in motivation, and felt a bright mood overall.  Her crying spells had decreased from daily to two or three times per week.  Later that month, plaintiff told Ms. Weimer that her symptoms of depression had decreased and her crying spells were down to once a week.  In June 1999, plaintiff told Ms. Weimer her sleep had improved and her symptoms of depression continued to improve.  In July 1999, plaintiff told Ms. Weimer that her crying spells continued to decrease.  She said that on a scale of one to ten, her depression was initially a 13 but was at that time a three to five.  Her isolative behavior had

decreased and she was working as an aide. On October 1, 1999, when plaintiff was discharged from the care of Ms. Weimer, Ms. Weimer stated that plaintiff's condition at discharge was "improved."

In February 2003, plaintiff was seen at Truman Medical Center and stated that she had a previous episode of depression shortly after her brother was murdered and that she received successful treatment and counseling. As mentioned above, plaintiff's supervisor at the Girls and Boys Club in 2002 had no knowledge of any physical or mental impairment suffered by plaintiff.

All of the evidence in the record on this factor indicates that the duration of plaintiff's depression was short (clearly less than 12 months), her symptoms did not occur frequently as her symptoms were very rarely observed by anyone, and her symptoms could not have been intense as she was able to work for four years after her alleged onset date, and her last supervisor was unaware of any allegation of disabling impairment suffered by plaintiff.

This factor clearly supports the ALJ's credibility analysis.

**4.    *PRECIPITATING AND AGGRAVATING FACTORS***

There is almost no evidence of this factor in the record. On April 8, 1999, plaintiff told Dr. Vaughn that working helped her keep her mind focused. That statement by plaintiff is obviously inconsistent with her allegation of disability.

**5.   *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

In her Claimant Questionnaire, plaintiff reported that she did not know whether she had any side effects from her medication.  On February 29, 1996, plaintiff told her doctor at Truman Medical Center that although she had been prescribed Ibuprofen at her last visit, she was not taking it because she was afraid it would make her sleepy.  In March 1999, plaintiff reported that she was smoking marijuana about every other week.  In May 1999, plaintiff's psychiatrist, Dr. Vaughn, noted plaintiff's improvement over her first visit (this being her second) and continued her on the same medication.   Plaintiff did not participate in psychotherapy, and she never went to the depression group as recommended because she was busy taking care of her kids.

The evidence in the record establishes that plaintiff's symptoms improved almost immediately with medication, to the point where she was able to work for several years afterward without follow up for counseling, medication, or any other treatment.  The evidence also establishes that plaintiff did not experience any side effects from her medication.

This factor supports the ALJ's credibility analysis.

**6.   *FUNCTIONAL RESTRICTIONS***

In May 1999, Dr. Douglas Vaughan found that plaintiff's mental impairment was severe but was not expected to last 12 months.  Plaintiff saw another doctor on June 4, 1999, whose name is illegible.  That doctor indicated that plaintiff had no physically

41

medically determinable impairments except the benign tumor of her vulva which could cause some pain but would not be expected to last a year. On August 3, 1999, Dr. Hendler found that plaintiff had no severe impairment. On April 8, 1999, plaintiff told Dr. Vaughn that working helped her keep her mind focused. The doctor did not recommend against plaintiff's working and did not indicate that he disagreed with her on that factor.

The medical expert, Dr. Chance, testified that plaintiff does not have a severe mental health condition as there is "nothing pronounced or prolonged". He testified that the records do not establish that plaintiff was disturbed for a prolonged period of time, and the treatment records indicate that she was improving. Dr. Chance noted that there is no evidence in the record to substantiate a conclusion that plaintiff's concentration and ability to focus were impaired, the only thing substantiating that conclusion is plaintiff's own allegations.

I have found nothing in the record on this factor which supports plaintiff's allegations of disability.

B.      CREDIBILITY CONCLUSION

In addition to the factors discussed above, the ALJ noted that plaintiff was not treated by any doctor for any impairment for almost a year prior to her alleged onset of disability. She saw the doctor a few times that year for conditions unrelated to her impairment. Eight months passed with no medical treatment, one visit to a gynecology

42

clinic, and then another 11 months with no medical treatment. Subsequent to filing her application for disability, plaintiff went more than three and a half years with no medical care, and she worked, earning substantial income, during that time. This followed a short four-month period during which she was treated with counseling with a social worker and a few visits to a psychiatrist. She had been terminated from her last job and was receiving unemployment benefits which would soon end. The ALJ also noted that plaintiff's mental impairment reappeared coincidentally with the announcement that her second administrative hearing had been scheduled.

The ALJ directed that plaintiff be examined by Dr. Shabbir, a psychiatrist; however, plaintiff failed to appear twice at her scheduled appointments and was therefore not examined. Plaintiff failed to show for multiple appointments with social worker Anna Weimer and for two appointments with her treating psychiatrist, Dr. Vaughn, and she was discharged from treatment for dropping out of service. Plaintiff's attorney testified that plaintiff missed her appointments due to her impairment; however, the evidence reflects that plaintiff missed one appointment because she ran late meeting with her son's teacher, and her other allegations of unbearable pain were neither substantiated nor explained (since there is no evidence in the record that plaintiff suffers from a physical impairment causing pain). In fact, plaintiff failed to appear for one appointment on June 28, 1999, claiming that she was ill and had some medical issues that held her back from her appointment that she believed were related to her tumor surgery.

43

However, plaintiff presented no records indicating that she saw a doctor about those medical issues, and she saw no doctor about anything physical until August 3, 1999, when she saw Dr. Hendler, a consultative examiner.

Plaintiff was directed on several occasions to attend a depression group, but she never went. She explained that she did not attend the group because she had to cook for her kids at that time.

Based on all of the above, I find that the substantial evidence in the record overwhelmingly supports the ALJ's finding that plaintiff's allegations of disability are not credible. Therefore, plaintiff's motion for judgment on this basis will be denied.

## VII. *OPINION OF DR. VAUGHN*

Plaintiff next argues that the ALJ erred in failing to accord adequate weight to the opinion of plaintiff's treating psychiatrist, James W. Vaughn, M.D.

In this case, the ALJ had this to say about Dr. Vaughn:

On Apri 8, 1999, the date claimant filed her concurrent applications for disability benefits, she underwent an initial psychiatric evaluation at Comprehensive Mental Health Services performed by James W. Vaughn, M.D. . . . Dr. Vaughn noted claimant presented as depressed and tearful and that she showed evidence of much anger toward the person(s) who killed her brother. He reported that claimant exhibited no evidence of difficulty focusing. Dr. Vaughn provided diagnoses including major depressive disorder, severe, recurrent, without psychosis; and probable post-traumatic stress disorder. He noted claimant's situation included severe psychosocial stressors including her finances and the recent murder of her brother, and he assigned a GAF score of 55, indicative of no more than a moderate degree of symptomatology or limitation of functioning. He prescribed Zoloft and Benadryl to help treat her symptoms and instructed claimant to continue the counseling sessions with the intake social worker. Claimant failed to attend a counseling session scheduled for April 27, 1999. . . .

44

During a May 6, 1999 session with the social worker, as well as during consultation with Dr. Vaughn, she reported a significant improvement of symptoms. She specified that she had experienced improved mood, motivation, sleep, energy, appetite, and hygiene, and decreased crying spells. . . . Also on that date, at claimant's request, Dr. Vaughn completed a Daily Activities Questionnaire . . . He also noted claimant's symptoms had improved with treatment, that she tries to keep busy, that she provides care to her 2 children, and does volunteer work when able. Also on that date, upon forwarding copies of his treatment notes to the Social Security Administration, Dr. Vaughn opined that claimant would have difficulty doing a full-time job currently because of depression, problems focusing, and difficulties being around others. During the May 20, 1999 counseling session, claimant again advised the social worker that she experienced a continued decrease of depressive symptoms, but stated that she could not attend depression group classes due to needing to cook for her children. On June 3, 1999, she advised the social worker that she was "feeling brighter". Also on that date, claimant advised Dr. Vaughn that she is "doing better" and the psychiatrist prescribed an increased dose of Zoloft. On June 14, 1999, claimant again advised the social worker that she continued to have improvement in her depressive symptoms. . . . On July 21, 1999, claimant reported continued improvement of her depressive symptoms, decreased crying spells, and decreased isolative behavior, and she noted that she was working temporarily as an aide in a mental health setting with varied hours. . . . claimant failed to attend the next 3 scheduled appointments. The treatment facility closed her case on October 1, 1999. The discharge note on that date was completed by the licensed clinical social worker and includes a diagnosis of major depressive disorder, single episode, with psychosis; however, Dr. Vaughn, the treating psychiatrist, never made a diagnosis of psychosis during any treatment encounter. . . .

. . . The Administrative Law Judge accords only limited weight to the treating psychiatrist's May 1999 opinion regarding claimant's capacity for full-time work. That opinion indicates that claimant would have some "difficulty," but does not rise to a level to indicate a medical opinion that claimant was totally precluded from full-time work. Further, that opinion was made only after his 2nd encounter with claimant and the treatment notes for the 2 1/2-month timeframe thereafter repeatedly indicate that claimant had continued to experience significant improvement in her symptoms. Furthermore, the evidence of record demonstrates claimant did not seek any further medical treatment for her alleged disabling mental pathology for a timeframe of 3 1/2 years thereafter. Moreover, the psychiatrist's opinion . . . regarding claimant's "difficulty" for full-time work is

> directly contradicted by claimant's own demonstrated ability to perform substantial gainful activity in 1999 through at least October 2002.

(Tr. at 26-27, 29).

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

1.    **Length of the Treatment Relationship.** The ALJ correctly pointed out that the opinion at issue was rendered after plaintiff's second visit with Dr. Vaughn, and those two visits occurred on April 8, 1999, and May 6, 1999 – two visits covering a 28-day period. Therefore, the length of the treatment relationship is not a reason to afford more weight to Dr. Vaughn's opinion.

2.    **Frequency of Examinations.** Plaintiff saw Dr. Vaughn twice before he rendered his opinion regarding her ability to work. This factor does not provide a reason to afford

more weight to Dr. Vaughn's opinion.

**3.      Nature and Extent of the Treatment Relationship.**  Dr. Vaughn saw plaintiff on April 8, 1999 – the day she filed her application for disability benefits – for an initial evaluation.  The notes indicate her took her history, obtaining her subjective complaints, and he conducted a mental status examination.  No other tests were done, and his diagnosis was major depressive disorder, severe, recurrent, without psychosis, probable post-traumatic stress disorder.  On May 6, 1999, plaintiff's second appointment with Dr. Vaughn, the doctor recorded that he saw plaintiff for 20 minutes.  He performed no tests, and made no observations.  He recorded only her subjective reports, which were that she was improving in many different ways, as outlined above by the ALJ.

That same day, the day of the second visit, Dr. Vaughn completed a form sent by Disability Determinations.  He wrote right on the form that no testing was ever done (Tr. at 225).  He also wrote on his treatment notes the following:  "SS form for DDS filled out after chart review & I also talked to Brooke Hamptom re: [illegible] she states medical records sent on my evaluation but they have nothing specifically from me and my evaluation re: ability to work."

It is clear that Dr. Vaughn did not have an in-depth treatment relationship with plaintiff.  He saw her once, prescribed medication and told her to see a social worker for counseling, and then he saw her a second time for 20 minutes during which she informed him that she was improving.  He then completed the disability form, indicating

47

specifically that his opinion was not based on tests.

This factor does not provide a reason to afford Dr. Vaughn's opinion more weight.

**4.      Supportability by Medical Signs and Laboratory Findings.**  This factor was discussed above.  The opinion at issue here was preceded by Dr. Vaughn's own statement that he performed no tests.

**5.      Consistency of the Opinion with the Record as a Whole**.  Dr. Vaughn's opinion that plaintiff would have a difficult time working full time is contradicted by the entire record, even his own treatment notes.  His notes reflect continuous improvement by plaintiff.  Her treatment ended after only four months, during which time she saw Dr. Vaughn only three times – April 8, 1999; May 6, 1999; and June 3, 1999.  She then went three and a half years without any medical care, and she was able to earn more than $50,000 working during that time.  It is clear that Dr. Vaughn's opinion that plaintiff would have a difficult time working is not supported by the record.

**6.      Specialization of the Doctor.**  Dr. Vaughn is a psychiatrist, a relevant specialist. However this factor does not provide a basis for crediting Dr. Vaughn's opinion any more than it was, as his opinion was not supported by his own treatment notes, by plaintiff's subsequent ability to work earning significant income, or by any other medical records in the file.

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's decision to give very little weight to the opinion of Dr. Vaughn in May

1999 that plaintiff would have difficulty working full time.  Therefore, plaintiff's motion for judgment on this basis will be denied.

## VIII.    *ABILITY TO PERFORM PAST RELEVANT WORK*

Finally, plaintiff argues that the ALJ erred in finding that plaintiff can perform her past relevant work.  This argument is without merit.

The vocational expert testified as to the demands associated with plaintiff's previous position as a social worker.  Therefore, the ALJ had adequate information regarding the duties of plaintiff's past relevant work.  Plaintiff's allegations of difficulty concentrating were note credible, and based on the information provided by the vocational expert at the hearing, together with the material provided by plaintiff in her administrative documents, the ALJ properly concluded that plaintiff had the residual functional capacity to perform her past relevant work.

In any event, the ALJ alternatively found at step five of the sequential analysis that plaintiff could perform other work in the national and regional economy.  The ALJ's hypothetical question to the vocational expert included only those limitations found credible by the ALJ.  The ALJ properly discounted plaintiff's allegations of impaired concentration, persistence, and pace.  Therefore, the vocational expert's testimony that a hypothetical individual with plaintiff's credible limitations could perform other work amounts to substantial evidence in support of the ALJ's conclusion.  Cruze v. Chater, 85 F.3d 1320, 1326 (8th Cir. 1996).

49

Because I find that the substantial evidence in the record supports the ALJ's findings both at step four and at step five of the sequential analysis, plaintiff's motion for judgment on this basis will be denied.

## IX. CONCLUSIONS

I find that the substantial evidence in the record supports the ALJ's findings that plaintiff is not credible, that Dr. Vaughn's opinion regarding plaintiff's ability to work is not entitled to much weight, that plaintiff can return to her past relevant work, and that plaintiff can do other jobs in significant numbers in the national and regional economy. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge


Kansas City, Missouri
May 3, 2005

Case 4:04-cv-00495-REL   Document 14   Filed 05/04/05   Page 50 of 50